UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
ANN ARBOR DIVISION

HOME POINT FINANCIAL
CORPORATION d/b/a HOMEPOINT,

        PLAINTIFF,

v.

LOAN FACTORY, INC.,

        DEFENDANT.

CASE NO. _____

## COMPLAINT

Plaintiff, Home Point Financial Corporation d/b/a Homepoint ("Homepoint"), states as follows for its Complaint against Defendant, Loan Factory, Inc.  ("Loan Factory"):

### PARTIES

1.      Homepoint is a New Jersey corporation, with its principal place of business in Ann Arbor, Michigan.

2.      Loan Factory is a California corporation, with its principal place of business in San Jose, California.

3.      At all times relevant to this Complaint, Homepoint was in the business of, among other things, purchasing and reselling residential mortgage loans on the secondary mortgage market.

4.      At all times relevant to this Complaint, Loan Factory was engaged in the business of originating, processing applications for, and preparing and arranging the closing and funding of residential mortgage loans.

5.      On August 4, 2021, Homepoint and Loan Factory entered into a contract entitled "Correspondent Mortgage Loan Purchase Agreement" ("Correspondent Agreement"), a true and correct copy of which is attached as **Exhibit A** and incorporated herein by reference.

## JURISDICTION AND VENUE

6.      Section 19 of the Correspondent Agreement provides in pertinent part that the parties "agree that any litigation arising out of or relating hereto or the transactions and activities contemplated hereby shall be submitted or be brought in Michigan. The parties hereto hereby agree to submit to the venue and jurisdiction of the federal and state courts located therein."

7.      This Court has jurisdiction over Loan Factory because it has irrevocably submitted to its jurisdiction in the Correspondent Agreement. Additionally, this Court has jurisdiction over Loan Factory because it transacted business with Homepoint in the State of Michigan.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Homepoint and Loan Factory are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this Court pursuant to the terms of Correspondent Agreement.

## STATEMENT OF FACTS

**I.      The terms of the Correspondent Agreement.**

10.     The Correspondent Agreement provides that Homepoint "has, from time to time, published and updated its Guidelines and Correspondent Seller Guide for correspondent lending . . . which set forth additional representations, covenants, warranties and rights of the Parties and the contents of those are specifically incorporated in this Agreement." Ex. A at 1.

11.     Section 2 of the Correspondent Agreement incorporates the Delegated Correspondent Seller Guide of Homepoint, as may be amended from time to time (the "Guide"), and specifically states that "[Loan Factory] shall be subject to the terms, conditions,

representations and warranties contained . . . in the Guide . . . . [and Loan Factory] acknowledges that any Guide posted on [Homepoint's] website or otherwise provided to [Loan Factory] may be amended from time to time by [Homepoint] without separate notice to [Loan Factory] . . . ." A true and correct copy of the relevant portions of the Guide are attached as **Exhibit B** and incorporated herein by reference.

12. Section 7 of the Correspondent Agreement provides, in pertinent part:

[Loan Factory] unequivocally and unconditionally makes each of the representations and warranties to [Homepoint] as set forth in Section 302 ("Representations and Warranties") of the Guide and warrants to [Homepoint] and agrees as follows as of the date of this Agreement.

13. Section 302 of the Guide sets forth Loan Factory's representations and warranties to Homepoint, which are, in pertinent part:

. . .

C.     Origination – All Loans have been "originated," which is defined to mean conduct of the initial borrower interview and the obtaining of a completed Form URLA Uniform Residential Loan Application by employees of [Loan Factory] (or, with respect to any Fourth Party Loans, by another mortgage lender or broker of [Loan Factory]) licensed with the Nationwide Mortgage Licensing System (NMLS) to originate residential mortgage loans for the appropriate state at the time the interview is conducted. [Loan Factory] further represents and warrants that each Loan sold to Homepoint meets the applicable product eligibility requirements established by Homepoint for the Loans. All defects, errors, deviations, variations, irregularities and discrepancies, both actual and perceived, on all Loans have been fully and thoroughly investigated, resolved, cured and remediated by [Loan Factory] prior to submission to Homepoint. No conditions (including underwriting or closing conditions) or contingencies remain outstanding.

. . .

M.     Compliance with Law; Origination; Payment Terms – [Loan Factory] complied with, and all Loans are in compliance with, all Applicable Laws, the Agreement, the Guide, and all applicable Investor Guidelines. [Loan Factory] is (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, except where such failure would not have a material adverse effect on the Loans, and (2) organized under the laws of such state, or (3) qualified

to do business in such state, or (4) a federal savings and loan associations or national bank having principal offices in such state. Principal payments on the Loan commenced no more than 60 days after the proceeds of the Loan were disbursed. The Loan requires interest payable in arrears on the first day of the month. Each mortgage note requires a monthly payment which is sufficient (i) during the period prior to the first adjustment to the mortgage interest rate, to amortize the original principal balance fully over the original term thereof (unless otherwise provided in the Guide) and to pay interest at the related mortgage interest rate, and (ii) during the period following each adjustment date in the case of each adjustable rate loan (or following each interest- only adjustment date in the case of each interest-only Loan), to amortize the unpaid principal balance fully as of the first day of such period over the then remaining term  of such mortgage note and to pay interest at the related mortgage interest rate. With respect to each Loan the related first lien does not permit negative amortization. None of the Loans are simple interest loans.

. . .

AA.   Income/Employment/Assets – [Loan Factory] verified employment in accordance with its written underwriting guidelines and employed procedures reasonably designed to authenticate the documentation supporting such income, employment and/or assets, all in accordance with the Guide. [Loan Factory] has reviewed all of the documents constituting the loan file and credit file and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

. . .

WW.   Salability – [Loan Factory] is unaware, does not know or suspect, and does not have constructive notice of adverse circumstances or issues which could impact the integrity, salability or the ability of the Loans to be securitized by any agency or investor or which may otherwise have any bearing on Homepoint's decision to purchase the Loan. The Loans and Loan Packages are eligible for purchase and/or the issuance of insurance by the applicable investor or agency, and if applicable, are eligible for securitization by GNMA. No Loan submitted to Homepoint by [Loan Factory] has been previously rejected for purchase by other investors, lenders, or secondary market participants, without prior written notice to Homepoint.

14.   The Guide refers to and incorporates the Selling Guide for Federal National Mortgage Association ("Fannie Mae"), which, in Section B3-6-02 among other sections, provides

the required debt-to-income ratios of loans that are eligible for purchase from Fannie Mae. *See* Ex.

B at 39.[1]

15.    Section 302.3.1 of the Guide provides, in pertinent part:

> [Loan Factory] shall indemnify, defend, and hold harmless Homepoint, its affiliates, directors, officers, agents, and employees, successors and/or assigns, from and against any and all damages, losses, liability, costs, actions, causes of action, judgments, claims, demands, regulatory agency or governmental proceedings or investigations, investor repurchase demands or sanctions, attorneys' fees, court costs or expenses both direct and indirect, arising out of or related to (i) [Loan Factory] 's breach of any representation, warranty or covenant of [Loan Factory] set forth in the Agreement; (ii) [Loan Factory] 's failure or omission to perform  any obligation set forth in the Agreement; and (iii) any fraud (whether active fraud or fraudulent omission) or misrepresentation found to exist in any Loan or any documents related to the Loan or utilized in any way during the origination process by any party.

16.    Section 302.3.3 of the Guide provides, in pertinent part:

> Homepoint may, in its sole and exclusive discretion, require [Loan Factory] to repurchase any Loan:
>
> (i) That was originated in violation of any term, condition, requirement, or procedure contained in the Agreement or this Guide in effect as of the date that the Homepoint purchased such Loan;
>
> (ii) That was originated based on any materially inaccurate information or material misrepresentation made by a Borrower, or by [Loan Factory], [Loan Factory]'s directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to such Loan;
>
> (iii) Upon receipt of a repurchase demand, make whole arrangement, or other remedy in lieu of a repurchase, or other notification from  any third-party investor (including but not limited to Fannie Mae, Freddie Mac, FHA, VA, HUD, GNMA or USDA) due to a breach by [Loan Factory] of any representation, warranty or covenant contained in the Agreement or a failure by [Loan Factory] to comply in all material respects with the applicable terms, conditions, requirements and procedures included in this

---

[1] The most recent Selling Guide for Fannie Mae may be found at https://servicing-guide.fanniemae.com/.

Guide. When Homepoint must repurchase a loan from any secondary market investor regardless of the reason(s) and/ or the merit(s) of any reason, [Loan Factory] must repurchase from Homepoint on demand without regard to any efforts Homepoint may or may have not taken directly or indirectly with any secondary market investor to mitigate repurchase; or

(iv) Upon [Loan Factory]'s breach of any representation, warranty, covenant or agreement contained in the Agreement with respect to a Loan.

Homepoint shall notify [Loan Factory] and [Loan Factory] shall have the opportunity to correct or cure such defect or breach within the time prescribed by Homepoint to the full and complete satisfaction of Homepoint. If, after receiving such notice, [Loan Factory] is unable to correct or cure such defect or breach within the prescribed time, then Homepoint shall have the right to (a) demand that [Loan Factory] repurchase such defective Loan (or if the related Loan has been foreclosed, the related real property shall be subject to purchase) at the Repurchase Price (as defined below); or (b) formulate such other remedy as Homepoint may deem appropriate.

For purposes of this section, "Repurchase Price" shall mean with respect to any mortgage Loan required to be purchased by [Loan Factory] pursuant to the Agreement, an amount equal to the sum of (1) the unpaid principal balance of the Loan; (2) all accrued but unpaid interest due Homepoint as of the date of repurchase; (3) all expenses, including but not limited to reasonable attorneys' fees incurred by Homepoint in enforcing [Loan Factory]'s obligation to repurchase such Loan; (4) any servicing expenses relating to the Loan, including any servicing advances made by Homepoint as servicer; and (5) any premiums paid to [Loan Factory] for purchase of the Loan.

17.    Section 11 of the Correspondent Agreement provides, in pertinent part:

Remedies. The remedies available to [Homepoint] may vary based on the event of default that has occurred, and are set forth in the Guide. Remedies include, but are not limited to, indemnification, repurchase, early payment default, rescission, suspension, termination, in each case as more fully set forth in the Guide.

18.    Section 302.3 of the Guide provides, in pertinent part:

In addition to any other remedies it may have at law or in equity, for any Loan sold to Homepoint, and for any Loan, Homepoint may require [Loan Factory] to:

- Indemnify Homepoint and hold it harmless for any loss, damage or expense (including court costs and reasonable attorney fees) that it may sustain, and/or

- Repurchase Homepoint's interest in the Loan at any time if the borrower or any other party to the transaction has made any misstatement, misrepresentation or omission in conjunction with such transaction, whether or not [Loan Factory] was a party to or had knowledge of such false representation, and/or

- Repurchase Homepoint's interest in the Mortgage or comply with the terms of any repurchase alternatives at any time, and/or

- Suspend or terminate [Loan Factory]'s eligibility as an approved correspondent or [Loan Factory], and/or

- Set off any amounts owed by [Loan Factory] to Homepoint against any other funds that Homepoint owes to [Loan Factory], such as workout incentives, expense reimbursements or any other amounts.

**II.    Loan Factory is obligated to repurchase the subject loan from Homepoint under the terms of the Correspondent Agreement.**

19.     On February 10, 2022, Homepoint purchased a mortgage loan concerning a property located at 13161 Pinnacle CT, Chino Hills, CA 91709, and identified as Hompoint Loan Number xxxxxx2629 (the "Loan"), from Loan Factory under the Correspondent Agreement.

20.     Pursuant to the Correspondent Agreement and the Guide, Homepoint maintains the right to, in its sole and exclusive discretion, require Loan Factory to repurchase any loan not in conformity with the terms of the Correspondent Agreement. *See* Ex. B at 29.

21.     After Homepoint purchased the Loan from Loan Factory, it was discovered that the Loan was in violation of the guidelines, standards and requirements referenced in the Correspondent Agreement because: (1) the borrower and/or Loan Factory failed to disclose borrower's car loan, which negatively impacted borrower's debt to income ration in violation of Fannie Mae's rules, requirements and guidelines; and (2) the Loan was underwritten and/or originated in violation of the Correspondent Agreement and Fannie Mae's rules, requirements and guidelines (the "Loan Defects").

22.     As a result of the Loan Defects, Homepoint was forced to repurchase the Loan from Fannie Mae because it was not in conformity with the applicable guidelines, standards and requirements set forth and referenced in the Correspondent Agreement/Guide and Fannie Mae's rules, requirements and guidelines.

23.     Homepoint sent Loan Factory notice of its repurchase obligation and demanded that it cure the Loan defects or repurchase the Loan as required under the terms of the Correspondent Agreement.

24.     Despite Homepoint's notice and demand, Loan Factory failed to cure the Loan Defects or repurchase the Loan as required under the terms of the Correspondent Agreement.

25.     As a result of its failure to cure the Loan Defects or repurchase the Loan, Loan Factory has breached the Correspondent Agreement and caused damage to Homepoint.

26.     Loan Factory's breaches of the Correspondent Agreement relating to the Loan have resulted in total amounts due to Homepoint in excess of $248,872.12, excluding interest, attorneys' fees, and other amounts Loan Factory owes to Homepoint.

## COUNT I: BREACH OF CONTRACT

27.     Homepoint incorporates the allegations contained in Paragraphs 1 through 26 of this Complaint as if set forth fully herein.

28.     As set forth in greater detail above, Loan Factory is contractually obligated to repurchase from Homepoint any loan sold under the Correspondent Agreement which Homepoint was forced to repurchase from Fannie Mae or which is otherwise not in conformity with the applicable guidelines, standards and requirements set forth and referenced in the Correspondent Agreement.

29.     Homepoint was forced to repurchase the Loan from Fannie Mae because it did not conform to the applicable guidelines, standards and requirements for Fannie Mae and under the Correspondent Agreement.

30.     Homepoint has sent all required notices and satisfied all conditions precedent to Loan Factory's performance under the Correspondent Agreement.

31.     Loan Factory breached the Correspondent Agreement when it delivered a loan that failed to conform to the applicable guidelines, standards and requirements set forth and referenced in the Correspondent Agreement and subsequently refused to cure the Loan Defects or repurchase it.

32.     Loan Factory's breach of the Correspondent Agreement in relation to the Loan has caused Homepoint to incur damages in excess of $248,872.12, excluding interest, attorneys' fees, and other amounts Loan Factory owes to Homepoint.

33.     Pursuant to the terms of the Correspondent Agreement, Homepoint is also entitled to indemnification from Loan Factory, and to recover its other damages, including reasonable attorneys' fees, expenses, and costs arising from Loan Factory's breaches of the Correspondent Agreement.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Home Point Financial Corporation, asks that this Court enter judgment in its favor and against Defendant Loan Factory, Inc. for damages in an amount to be proven at trial, including but not limited to prejudgment interest through the date of judgment, post-judgment interest as provided by law, attorneys' fees, expenses, costs, and all other relief the Court may deem just and proper.

*/s/ Erik Johnson*

Erik Johnson
Plunkett Cooney
38505 Woodward Ave Ste 100
Bloomfield Hills, MI 48304
Telephone: (248) 433-2311
Email: ejohnson@plunkettcooney.com

Neal Bailen
Corey J. Dunn
STITES & HARBISON PLLC
323 East Court Avenue
Jeffersonville, IN  47130
Telephone:  (812) 282-7566
Email:  nbailen@stites.com
            cdunn@stites.com

*Counsel for Home Point Financial Corporation*

Dated:  June 12, 2023

Open.29462.31899.31258285-1